The BOEING COMPANY, Petitioner,

v.

The NATIONAL LABOR RELATIONS
BOARD, Respondent.

and

Local 286–W, International Union of
Operating Engineers, AFL–CIO,
Intervenor.

No. 77–2674.

United States Court of Appeals,
Ninth Circuit.

Sept. 11, 1978.

Bruce M. Cross (argued), of Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for petitioner.

Howard Perlstein (argued), Washington, D. C., for respondent.

Steven B. Frank (argued), Seattle, Wash., for intervenor.

Before DUNIWAY and WRIGHT, Circuit Judges, and KUNZIG,* Judge.

KUNZIG, Judge:

This case, involving a challenge to a National Labor Relations Board (NLRB or Board) interpretation of the recognition clause in a Collective Bargaining Agreement between the Boeing Company (the Company) and Local 286–W, International Union of Operating Engineers, AFL–CIO (the Union), is before the court on the Company's petition for review of a Decision and Order of the Board issued on July 8, 1977,

* The Honorable Robert L. Kunzig, Judge, United States Court of Claims, sitting by designation.

230 N.L.R.B. ——, and on the Board's cross-application for enforcement of its Order. Because we agree with the Company that the Board's questioned interpretation has the effect of extending a standard "Recognition Clause" into an unbargained-for "Jurisdictional Clause," we grant the relief sought by the Company and deny enforcement of the Board's Order.

The Company is a major manufacturer of hydrofoils, which are produced at its Seattle, Washington plant. The process of piecing together the hydrofoil requires sheets of aluminum to be cut, fitted together, and then "tack" welded to hold them in place, pending the final welding. In an effort to produce hydrofoils more efficiently, the Company decided to train a number of "cutters and fitters," represented by the International Association of Machinists and Aerospace Workers, Local 751, to do tack welding so that they could perform the minimal number of such welds required incidental to their main tasks of cutting and fitting. The Company informed the Union of its intention, but the Union refused to assent to such cross-training on the grounds that all such work should, under the Company/Union Collective Bargaining Agreement (the CBA), be assigned to the Union.

Certain tack welds, it appears, did become part of the final welds in the production of hydrofoils and tack welding does require the same garden variety of skills as does the final welding. In early 1959, the N.L.R.B. had determined that those employees qualified to do all welding (tack welding *and* final welding) constituted a "craft group" and separated them from the existing maintenance and production workers, enabling the Union to become their representative. The Board based its decision on the fact that qualified welders "performed skilled work, subject to rigid inspection, and require a long period of on-the-job training and experience." The training required by the cutters and fitters to enable them to do only tack welds, however, consisted of only a two-week training period. Thus they had only a fraction of the welding skills required of a full production welder.

In the current dispute, the N.L.R.B. found that, during all contract negotiations since the initial 1959 certification of the Union as the Bargaining Unit Representative of the welders, neither the Union nor the Company ever discussed any of the welders' specific duties, or tack welding in particular, and that they never considered the question of assignment of welding unit work, or tack welding in particular, to non-unit employees; whenever a dispute arose over job classifications or specific jobs, the parties petitioned the Board to clarify the unit. On two previous occasions, the Board had excluded, from the jurisdiction of the Union, employees who performed "welding" type operations, but "were easily trained," "were not required to [have] . . . the complex of welding skills", or "were not required to be certified by the government." In 1974, however, certain employees were included in the Union's bargaining unit because they were "required to exercise traditional welders skills."

The CBA in effect at the time of the alleged violation now in issue once again had no clause expressly assigning particular job functions to welders. It did, however, contain the standard bargaining unit description found in previous CBAs and in the Board's certification.[1]

1. This bargaining unit description described the "unit covered" as follows:

> All welders, including research, high strength, production, burner, gas and arc, maintenance A and maintenance B welders, welder leadmen, burners' apprentices and helpers, and including all employees operating machine welding equipment where, in the operation thereof and in the process of the weld, based on the employees' sight or sound observations, the equipment may require adjustment in variables such as travel speed, arc voltage, arc gap, current, amount of filler metal being fed into welding puddle, seam tracking or adjustment for variations in the thickness of material, mismatch or gap, in

The Board, acting on the Union's charge against the Company, found that the Company's action in assigning some tack welding work (a maximum of 5% of any cutters' or fitters' working hours) to non-Union workers constituted violations of subsections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1)–(a)(5) (1970).

The Administrative Law Judge by whom this dispute was initially heard determined that only four of the 14 tack weld-trained employees had actually performed tack welding operations and that they had worked at tack welding for only about 45 total hours before the Company ceased the practice because of a cutback in production. He further found that certain other non-Union employees had performed tack welding functions sporadically over several years without Union complaint (and possibly without Union knowledge) and that several non-Union-represented Company job descriptions listed "tack welding." However, he determined that, as a whole, all the Company's welding work since 1959 had been performed by Union employees.

In addition, he ascertained that, although no Union-represented employees lost work hours or were laid off because of the Company's change of policy, there were Union-represented craft welders already in a laid-off status who could have been reemployed to perform the tack welding.

His conclusions are best summed up in his own words:

Therefore, I find that tack welding has been a part of the contractual bargaining unit during the history of Respondent's bargaining relationship with the Union and that it is work which belongs to the employees whom the Union represents under the existing collective-bargaining agreement with Respondent.

The N.L.R.B. affirmed and adopted his decision and his order. The Company petitioned this court to review and set aside the Board's decision and order and this court assumes jurisdiction, pursuant to subsections 10(e) and 10(f) of the Act, 29 U.S.C. § 160(e)–(f) (1970).

The main issue in this case is dramatically pointed out by the positions taken by the parties before this court. Stripped of all subsidiary arguments, the Union and the Board, emphasizing the categorization "welder," go to great lengths to establish the logical progression necessary to make the cutters and fitters who were doing the tack welding into "welders." The tack weld, they argue, requires a certain expertise available only within the craft designation "welder"; the tack weld, historically at Boeing, has always been performed by welders; the reassigned tack welding was more than a de minimis portion of the work performed by the employee to whom it was assigned; and whenever there has been a dispute over whether someone is a "welder," within the meaning of the recognition clause, the parties have come to the Board for a clarification of the bargaining unit. The Union and Board then make the logical jump of saying that, because of these demonstrated relationships between "tack welding" and "welders," the Company implicitly agreed to assign all tack welding to "welders" represented by the Union (and, thus, not to cutters or fitters represented by another union) when it explicitly agreed, in the recognition clause, that all "welders" should fall within the bargaining unit represented by the Union. From there, it is an easy step to reason that any attempt to reassign tack welding constituted a mid-term modification of the CBA which, when made without the consent of the Union, constituted an unfair labor practice. Since

order to produce a satisfactory weld, employed by the Employer at its plant and operations located in the state of Washington, excluding automatic fusion welding machine operators, sheet metal worker and welder maintenance C employees, employees operat-

ing the Airco gas tungsten arc welding machine at the Employer's Auburn, Washington, plant, office clerical employees, professional employees, guards, all other employees, and supervisors as defined in the Act.

the Board has wide discretion and expertise, their argument concludes, since the parties here have historically resorted to the Board in disputes over job classifications or specific jobs, and since substantial record evidence indicates that the Company actually did assign some welding functions to non-union members, the decision of the Board should be affirmed and its order enforced.

The Company, on the other hand, charging the Union and Board with arguing in "non-sequiturs," concentrates on the *function* of "tack welding" and asserts that nowhere in the CBA is any function, especially the function of tack welding, granted exclusively to employees represented by the Union and that there is nothing in the CBA even remotely resembling such a "Jurisdictional Clause." Its basic argument is that the "Recognition Clause," relied upon by the N.L.R.B. and the Union is basically a clause which describes "people (i. e., welders, the members of the craft Union)" and not "functions." Thus, the question addressed by the Company is whether the "people" performing the tack welding functions were "welders" within the meaning of the "Recognition Clause." The non-skilled nature of the work involved, the *de minimis* amount of the tack welding when compared to the cutting and fitting tasks performed, and when compared to the total number of hours worked by "welders," and the fact that none of the work was taken from individuals already designated "welders" all assume significance in bolstering the Company's argument that the "people" doing the tack welding were not "welders" within the meaning of the Recognition Clause.

Finally, the Company argues that the N.L.R.B. has no special competence in a case such as this where the only matter involved is the interpretation of a Recognition Clause.

We agree with the Company. The Board in this case has misinterpreted a recognition clause in such a way as to impose on the Company a jurisdictional guarantee which was not bargained for by either party and which clearly did not appear in the CBA. For this reason, we deny enforcement of the Board's order.

Despite the protestations of the Union and the Board that the only question before us is whether the Board's decision is supported by substantial record evidence and despite their consequent reliance on factual evidence, it appears that the Company's concept of the central legal issue here is correct: whether the Recognition Clause in a CBA, recognizing coverage by the Union of certain "people," may be extended by implication to become a Jurisdictional Clause, reserving exclusively for the Union all "functions" which might normally have been performed by those "people." If this question be answered in the affirmative, all of the Union/Board arguments concerning "mid-stream modifications," which follow automatically, are supported by substantial record evidence and the Board's order should be enforced. If, however, the question be answered in the negative, then the legal underpinning of the Board's rationale fails and the decision of the N.L.R.B. must be set aside.

The confusion of the Administrative Law Judge (ALJ) and, by adoption, the Board on this vital issue is readily apparent from the wording of his findings:

> Therefore, I find that *tack welding* has been a *part of the contractual bargaining unit* during the history of Respondent's bargaining relationship with the Union. . . . (emphasis added)

Without ever explicitly so stating, the ALJ apparently found either that "tack welding" was an employee—part of the "bargaining unit"—or that the Recognition Clause could *legally* be extended to cover "functions."

At least one Circuit Court of Appeals has already determined that a Recognition Clause cannot be so extended. The Seventh Circuit, in *University of Chicago v. N.L. R.B.*, 514 F.2d 942 (1975), held that work *functions* could be reassigned from individuals *who had been performing them* to other employees not within the same union, even though the Recognition Clause *explicitly mentioned the functions* in its descriptions of the employees to be within the

bargaining unit represented by the union. It termed the N.L.R.B. contention that the Recognition Clause, as interpreted through history, impliedly prevented function reassignment (essentially the same rationale asserted in the present case) a "novel" theory and stated:

> As we read the cases, *unless transfers are specifically prohibited by the bargaining agreement*, an employer is free to transfer work out of the bargaining unit if: (1) the employer complies with *Fibreboard Paper Products v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), by bargaining in good faith to impasse; and (2) the employer is not motivated by anti-union animus, *Textile Workers v. Darlington Mfg. Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). (514 F.2d at 949)

The Seventh Circuit found that the University had complied with the requirements in that case and declined to enforce the order. In the case at hand, it is apparent that the Company complied with the conditions established by the Seventh Circuit in *Chicago*. The Union and the Board admit that the Company was motivated only by the desire to increase efficiency in production and that the Company talked with the Union until informed that the Union would not grant the approval sought by the Company.

The Board attempts to distinguish away the *Chicago* case, while the Union, recognizing that any possible relevant distinctions are not persuasive, urges this court to "reject the reasoning of the Seventh Circuit, and accept the N.L.R.B.'s analysis in University of Chicago and the instant case." Neither the Board nor the Union, however, provides any compelling argument which would lead us to depart from the persuasive rationale of the *Chicago* opinion.

The cases cited by the Union in an attempt to discredit the *Chicago* case, while bearing directly on the "mid-stream modification" issue, have, at best, only peripheral relevance to the real issue, the extension of a recognition clause into a jurisdictional clause. Indeed, nothing in the cases relied upon by the Union contradicts the opinion in *Chicago*, which interpreted the pertinent CBA to determine whether a particular action by an employer could, as a matter of law, constitute a mid-stream modification. *See N L Industries, Inc. v. N.L.R.B.*, 536 F.2d 786, 789 (8th Cir. 1976); *Leeds & Northrup Co. v. N.L.R.B.*, 391 F.2d 874, 877 (3d Cir. 1968); *Robertshaw Controls Co. v. N.L.R.B.*, 386 F.2d 377, 389 (4th Cir. 1967).[2] In addition to offering little convincing legal precedent to support the rejection of the *Chicago* rationale, the Union and the Board offer no compelling policy arguments. Their strongest policy assertion is that a failure to enforce the Board order could lead to the eventual whittling away of the Union by the Company through numerous, small function reassignments until no work is left for the Union-represented employees. This same consideration was argued—and failed—before the Seventh Circuit in *Chicago*. That court's conclusion is equally relevant here:

> . . . We, however, do not envision unions being picked apart piece-by-piece in total defiance of the statutory policy to stabilize labor agreements. That is not what occurred in this case, and that will not happen so long as the National Labor Relations Board sits and performs the solemn function that the Congress has assigned to it. (514 F.2d at 949)

In our present case, it is not difficult to foresee that, at some point in the hypothesized process of Union destruction, either an anti-Union animus on the part of the Company would become apparent and provide a basis for prohibiting further reassignment or the "reassignees," because they must possess substantial welding skills to perform all of the reassigned tasks, will bear sufficient factual resemblance to the "welders" covered by the Union's Recognition Clause that they will, by the terms of the CBA, be represented by the Union.

---

2. The N.L.R.B. appears to have gone both ways on the question of extending a Recognition Clause to cover functions. In *Chicago* and the present case, it endorsed such extension; in *Globe-Union, Inc.*, 222 NLRB 1081 (1976) and *American Buslines, Inc.*, 164 NLRB 1055 (1967) it seems to have taken the opposite tack.

In addition, a countervailing policy argument by the Company appears to have greater merit. Since the purpose of the Act is to encourage labor/management peace by resolving differences through collective bargaining and to stabilize *agreed upon* conditions during the term of a CBA, *Steelworkers v. Warrior and Gulf Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), a rejection of the Board's position here would seem to further the purpose of the Act. Rather than stretching the meaning of a Recognition Clause "impliedly," "implicitly," or "in effect" to cover "functions" (as did the Board), a decision against the Board would encourage the parties affirmatively to negotiate an explicit "Jurisdictional Clause" to be included in the next CBA.

Finally, the Company argues convincingly that the N.L.R.B. has no particular expertise (or special competence) to decide this particular issue since the entire matter turns purely on a legal interpretation of a ·Recognition Clause and requires no particular knowledge of employee functions or employer-employee relationships. Thus, the mandate that the conclusions of the Board are not to be disturbed if supported by substantial record evidence, *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), is of little solace to the Board since the N.L.R.B. is incorrect in its underlying legal premise—that a Recognition Clause may be extended to cover functions.

For all of the above reasons, we hold that the decision of the N.L.R.B., interpreting a Recognition Clause to be an implied jurisdictional clause, is without a sound basis in law and should be set aside, and that enforcement of the N.L.R.B.'s resulting order should be denied.

ENFORCEMENT DENIED.