**NEWSPAPER PRINTING CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1567.

United States Court of Appeals, Sixth Circuit.

Argued March 8, 1982.

Decided Nov. 1, 1982.

John B. Jaske, Wendell J. Van Lare, Rochester, N.Y., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Lawrence Song, N.L.R.B., Washington, D.C., for respondent.

Before ENGEL and KENNEDY, Circuit Judges, and BALLANTINE,* District Judge.

ENGEL, Circuit Judge.

The National Labor Relations Board and Newspaper Printing Corporation ("the Company") petition for enforcement and review, respectively, of an order of the Board dated July 28, 1980 and reported at 250 N.L.R.B. No. 132. The order affirmed a determination by the Administrative Law Judge ("ALJ") that the Company had violated sections 8(a)(1) and (5) of the National Labor Relations Act ("Act") by bargaining to impasse on a modification of the bargaining unit and by thereafter unilaterally implementing changes in the terms and conditions of employment of employees within the unit.

Our review is confined to the question whether there was substantial evidence to support the Board's findings in the face of the Company's claim that it had bargained to impasse on unit jurisdiction, or work assignment, but not on the description of the appropriate bargaining unit, which sets forth the scope of a union's representation.

The dispute must be viewed in light of changes in technology which have substantially altered the methods by which words are transmitted from their author to the pages of the newspaper and changes in the publishing business itself. Typesetting has progressed from "hot type" to "cold type" to "optical scanning" to "on line" transmission directly from the writer to the typesetting machine.[1] As a result, typesetting as a

---

* Hon. Thomas A. Ballantine, Jr., Judge, United States District Court for the Western District of Kentucky, sitting by designation.

1. The "hot type" or "hot metal process" involved the use of linotype machines by highly skilled employees in the composing room to set type in molten lead. Between 1960 and 1974, NPC introduced two technological advances into the typesetting process. First, NPC automated the linotype machines by using "perforated tape," and second, it changed from the

skilled trade has largely disappeared from the newspaper printing business, and during the past twenty years the technology of typesetting has seen the linotype machine largely relegated to history. In the publishing business, economic difficulties faced by the nation's newspapers in their struggle to compete with other media for the advertising dollar have forced them to turn to increasingly automated, complex and expensive machinery.[2] A careful review of the record and the extensive negotiations between the Company and Nashville Typographical Union, No. 20 ("the Union"), which finally led to impasse, clearly discloses the concerns faced by both management and union as a result of the ongoing changes in the methods of typesetting.

The Company and the Union have had a long history of collective bargaining. The most recent collective bargaining agreement before the negotiations that led to impasse covered the period from 1972 to 1975. In Article I of that agreement, the parties had consensually defined the appropriate bargaining unit in the following clause:

> hot metal method to the cold type system. The use of perforated tape was described in *Newspaper Printing Corp. v. N.L.R.B.*, 625 F.2d 956, 958 n. 3 (10th Cir. 1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981):
>> [H]ard copy or typewritten material is sent from the newsroom ... to the composing room.... [A] keyboard device is used to transfer the copy to perforated paper tape. The tape is then inserted into a linotype machine which produces traditional lead type for use in publication.
> Another court has described the cold type process:
>> "Cold type" is a process by which type is prepared by simply pasting printed material on a mat which in turn is photographed in a manner that transfers the image to a metal plate which when exposed to acid is etched into a finished plate ready for the press room. The cold type process eliminates the highly complicated linotype procedure. Consequently, it does not require any of the skilled labor necessary to the hot metal process.
> *N.L.R.B. v. Columbia Tribune Publishing Co.*, 495 F.2d 1384, 1386 (8th Cir. 1974).
> The negotiations leading to the present appeal concerned the use of "optical scanning" and "on line" systems. In the "scanning" sys-

**JURISDICTION**

Sec. 3. Jurisdiction of the Union and *the appropriate unit for collective bargaining is defined as including all composing room work* and includes classifications such as hand compositors, typesetting machine operators, makeup men, proofpress operators, proofreaders, machinists for typesetting machines, operators and machinists on all devices which cast or compose type or slugs, or film, operators of tape perforating machines and recutter units for use in composing or producing type, operators of all phototypesetting machines such as Fotosetter, Photon, Linofilm, Monophoto, Coxhead Liner, Filmotype, and Hadego, and employees engaged in proofing, waxing and paste make-up with reproduction proofs, processing the product of phototypesetting machines, paste-makeup of all type, hand-lettered illustrative, border and decorative material constituting a part of the copy; ruling; photoproofing; correction; alteration; and imposition of the paste-makeup serving as the completed copy for the camera used in the platemaking process. Paste-makeup for the

tem, the original writer types his material onto hard copy. This copy is then "scanned" or "read" and then stored in a computer as electronic impulses. The story can be edited on the computer and sent to the typesetting machine without retyping by composing room employees. The "on line" system further advances the process by allowing the original writer to type material directly into the computer for storage, editing and transmission to the typesetting machine.

2. The economic plight of the newspapers prompted Congress to enact the Newspaper Preservation Act, 15 U.S.C. § 1801 *et seq.*, which allows two or more newspapers to share certain operations without running afoul of antitrust laws. To obtain the antitrust exemption, the newspapers must have the approval of the Attorney General of the United States, 15 U.S.C. § 1803, and each newspaper must maintain separate editorial and reportorial departments, 15 U.S.C. § 1802(2). Under the Newspaper Preservation Act, petitioner Newspaper Printing Corporation provides the combined production, advertising and distribution facilities for the Nashville Banner and the Nashville Tennessean newspapers in Nashville, Tennessee.

camera as used in this paragraph includes all photostats and prints used in offset or letter-press work and includes all photostats and positive proofs of illustrations (such as Velox) where positive proofs can be supplied without sacrifice of quality or duplication of efforts. The Employer shall make no other agreement covering work above mentioned, especially no contract using the word "stripping" to do any of the work above mentioned.

App. 28 (emphasis added).[3]

At the time the 1972–75 agreement was negotiated, the Company was using primarily cold type and automated hot type processes. When the time came to negotiate a new agreement, however, the Company had begun to switch to a computer-aided typesetting process which used optical scanning equipment and made it unnecessary for composing room employees to retype or "rekeyboard" material that had already been typed by editorial or advertising employees. Both parties recognized that the language of the 1972–75 contract was outmoded because it referred to types of labor and mechanical processes which had long since disappeared and, at the same time, failed to resolve disputes concerning the Union's jurisdiction over the newer work methods either being employed or desired to be employed by the Company.

Negotiations for a new contract continued over more than two years. The parties could not agree upon a clause (or clauses) to replace the "Jurisdiction" clause found at Article I, Section 3 of the 1972–75 agreement. After offering at least two other alternate proposals, the Company made a final offer in April 1976. The "Jurisdiction" clause in this proposal provided:

**JURISDICTION**

*Section 3. Jurisdiction of the Union and the appropriate unit for collective bargaining is defined as including all work performed in the composing room. Composing room work shall include the work performed in the classifications of electronic technicians, Ad Make-up machine operators, Paste Make-up and all other composing room employees,* including work assigned to the composing room and performed at or on Linotron 505's, Log-E Film Processors, Harris 2200 Display Systems, Bruning Proofing and other proof presses, Ad Desk, Ad Make-up and Page Make-up or substitute or similar equipment and processes placed in and assigned to the composing room from time to time, it being specifically understood that composing room employees shall process copy in whatever form, wherever and however produced that is delivered to the composing room.

Jurisdiction of the Union and bargaining unit work and/or composing room work shall not include work performed on or by general purpose computers, micro processors, mini computers, optical character recognition devices and/or optical scanners, VDT and/or CRT equipment, IBM selectrics, leased telephone wire copy, all wire service input devices, wire copy, syndicated matter and feature materials, or replacement or substitutes for same, or the programming or reprogramming, maintenance or operation of any equipment within the jurisdiction of the Union.

App. 43–44 (emphasis added).

The Company did not move from this proposal, and following more negotiations, a federal mediator declared an impasse on October 27, 1977. Based on this impasse in bargaining over the "Jurisdiction" clause, the Company implemented unilateral changes in terms and conditions of employment in January and February 1978.[4]

---

3. Literally, the 1972–75 agreement defined the appropriate unit as "all composing room work." For this clause to provide a meaningful description of the employees represented by the Union, one must read the clause to say that the appropriate unit is *all employees who perform* "composing room work." The testimony at the administrative hearing shows that the parties had indeed considered the clause to have such a meaning—a description of the employees represented by the Union based upon their job functions.

4. The Company and Union later reached a collective bargaining agreement which was effec-

The Union filed unfair labor practice charges on March 22, 1976, alleging that the Company had violated section 8(a)(5) of the Act by implementing unilateral changes after bargaining to impasse over the appropriate unit description, a permissive subject of bargaining.

Following a five day hearing, the ALJ concluded that the Company had unlawfully bargained to impasse on the permissive subject of the scope of bargaining unit and that, based on this impasse, the Company had unilaterally changed terms and conditions of employment. The ALJ compared Article I, Section 3 of the impasse proposal with the same section in the 1972–75 collective bargaining agreement. Because the impasse proposal altered the language defining the Union's work jurisdiction and unit description from "all composing work" to "all work performed in the composing room" and because he found that language substantial and meaningful in terms of the unit description, the ALJ found that the Company had unlawfully bargained to impasse on a permissive subject for collective bargaining.

The Board affirmed the ruling, findings and conclusions of the ALJ, without further discussion or analysis of the issue of bargaining to impasse over unit description. The Board only stated: "we note that although the pertinent section of the contract is entitled 'Jurisdiction,' the parties bargained to impasse over the unit description and not work jurisdiction alone." 250 N.L.R.B. at 144 n. 3.

In its appeal to this court, the Company contends basically that the impasse proposal did not include any real change in the unit description as historically agreed to by itself and the Union, and thus, the Board's order is not supported by substantial evidence. At the heart of the dispute is the fact that the Union's unit description and its jurisdiction were not separated in the collective bargaining agreement but were both contained in Section 3 of Article I. Thus, when the Company attempted to change the jurisdictional aspects of the clause, it also risked changing the unit description.

■ Jurisdictional clauses concern the assignment of work to union members and are mandatory subjects of bargaining. *See Newspaper Printing Corp. v. N.L.R.B.*, 625 F.2d 956, 964 (10th Cir. 1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981); *Boeing Co. v. N.L.R.B.*, 581 F.2d 793, 797 (9th Cir. 1978); *Univ. of Chicago v. N.L.R.B.*, 514 F.2d 942, 949 (7th Cir. 1975); *see also Fibreboard Paper Prods. Corp. v. N.L.R.B.*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

■ A unit description clause agreed to by union and employer, on the other hand, sets forth the scope of membership in the collective bargaining unit and is a permissive subject of bargaining. *See Newspaper Printing Corp. v. N.L.R.B., supra,* 625 F.2d

---

tive September 6, 1978. Under this agreement, the appropriate unit and the work jurisdiction of the Union were separately defined. Article I, Section 3 of the agreement provides that "[t]he appropriate unit for collective bargaining is defined as including all composing room employees employed at the Employer's facilities in Nashville, Tennessee, but excluding office clerical employees, professional employees, guards and supervisors as defined in the Act." App. 62. Section 4 of Article I of that same agreement describes the work jurisdiction of the Union as "including all work performed in the composing room, and that work which the Company may from time to time assign to the composing room." App. 62. Composing room work is thereafter described in terms of those employees who work there but "shall not extend to or include any other work, type of work

or classification of any and every kind, whenever, wherever and however performed, and regardless of who performs such work, that is not specifically enumerated herein above as being in the jurisdiction of the Union." App. 63. The ALJ found that "[t]he September 6, 1978 contract ... incorporates the changes instituted on January 6 and February 5, 1978." App. 10.

Thus, the impasse which brought about the instant unfair labor charges was itself resolved prospectively by the new collective bargaining agreement. The efforts of the parties, however, to resolve the differences which remain concerning the conduct of the Company for the period of time between impasse and the date the new agreement took effect failed to receive Board approval, and it is these problems which the Board's order seeks to resolve.

at 963;  *Newport News Shipbuilding & Dry Dock Co.,* 602 F.2d 73, 76 (4th Cir. 1979); *Hess Oil & Chemical Corp. v. N.L.R.B.,* 415 F.2d 440, 445 (5th Cir. 1969), *cert. denied,* 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970);  *Douds v. Int'l Longshoremen's Ass'n,* 241 F.2d 278, 282–83 (2d Cir. 1957); *but cf. Newspaper Production Co. v. N.L.R.B.,* 503 F.2d 821 (5th Cir. 1974) (allowing employees to bargain to impasse on restriction of bargaining unit where issue was whether there should be one union or two). If the employer and union cannot agree upon the description of an appropriate unit the Board will determine an appropriate unit through a certification procedure.[5]

▮▮▮▮ Following good faith bargaining to impasse on a mandatory subject, an employer may unilaterally change terms and conditions of employment.  By mutual consent, the parties may bargain as well concerning the scope of the bargaining unit, a permissive subject of bargaining.  *N.L.R.B. v. Borg-Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958).  Because such bargaining is permissive only, however, it is a violation of section 8(a)(5) of the Act for one party or the other to bargain to impasse, or to condition bargaining on mandatory bargaining issues, on such a subject.  *Id.*

In the present case, the ALJ and the Board simply looked at the language of the impasse clause to conclude that the Company had sought to change the unit.  We agree with the Company, however, that our inquiry must extend beyond the facial wording of the unit description to determine whether unit described in the impasse proposal was the same as the parties agreed to in the 1972–75 contract.  *See generally Newport News Shipbuilding and Dry Dock*

Co. v. N.L.R.B., 602 F.2d 73, 77 (4th Cir. 1979).  If the language of the impasse proposal submitted by the Company had not incorporated almost the identical language of the 1972–75 agreement, we might be inclined to hold that the Board could find a violation on the face of the proposal.  Given the strong similarities in language, however, and the legitimate interest of the Company in seeking a different form of collective bargaining agreement which would sensibly separate the concept of unit jurisdiction and work jurisdiction, we believe that it was necessary for the Board to have looked further into the record to determine whether employees' representation rights were in fact prejudiced.  We conclude that there is simply a dearth of evidence to indicate that the impasse proposal took away the representation rights of any members of the Union affected.

Although the 1972–75 agreement used the words "all composing room work" while the impasse proposal stated "all work performed in the composing room," the evidence at the administrative hearing shows that those two phrases described the same tasks.  The international representative of the Union testified that the "composing room" meant "any area where composing room work was being done...."  App. 229. The testimony of that Union official and the local president shows that the term "composing room" signifies more than a geographic area, and that "composing room work" and "work performed in the composing room" had historically been viewed as synonymous.  Upon an examination of the proofs and record, we find no evidence that any employees within the previously agreed upon appropriate bargaining unit would not be represented by the Union under the impasse proposal.

---

**5.** Although the distinction between work assignment or jurisdiction and unit description may be simple in the abstract, the Eighth Circuit has recognized that the problem becomes more difficult in the setting of automation:

> There is one substantial difference between the instant situation, where unit jobs are put into jeopardy by the advance of automation, and the *Fibreboard* case [*Fibreboard Paper Products Corporation v. NLRB,* 379 U.S. 203

(1964)] where the jobs were threatened by a subcontracting arrangement.  In the latter instances the bargaining unit, even though it was on the verge of dissolution, was nonetheless delineated by static and acknowledged boundaries.  By contrast, one of the inherent byproducts of automation is a blurring of the bargaining unit boundaries.

*N.L.R.B. v. Columbia Tribune Publishing Co.,* 495 F.2d 1384, 1390 (8th Cir. 1974).

The Company argues, and we think properly, that the negotiations in fact had centered around the Union's jurisdiction and not the question of the appropriate unit, although there is evidence that the Union itself may have indeed been interested in expanding the scope of its own coverage to personnel not previously included. At the same time, it is also clear that the Company was anxious not to yield its right to bargain collectively on the work jurisdiction of the Union. Examining the entire impasse proposal, we find that the Company was careful to preserve the unit description while changing the jurisdiction clause about which it did have a right to bargain to impasse. This was altogether appropriate.

The present case stands in contrast to factual situations considered by other courts where the employer had attempted to abolish the unit or to reserve the right to do so in its discretion. In *N.L.R.B. v. Columbia Tribune Publishing Co.*, 495 F.2d 1384 (8th Cir. 1974), the newspaper had changed from hot metal to cold photo composition. During negotiations for a new collective bargaining agreement, the paper submitted a proposal which omitted any clause recognizing the Union as exclusive bargaining representative for employees of the composing room. The Board found that the newspaper had violated its duty to bargain in good faith by refusing to incorporate in the collective bargaining agreement any appropriate unit description. The distinction between that case and the present facts is apparent: the employer in *Columbia Tribune* completely refused to include a unit description, but the Company here was always willing to include a clause recognizing the appropriate unit, although the proposed clauses did differ in their specific language from that found in 1973–75 agreement.

In *Newspaper Printing Corp. v. N.L.R.B.*, 625 F.2d 956 (10th Cir. 1980), *cert. denied* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981), the newspaper and the union had a clause in the prior collective bargaining agreement similar if not identical to that of Article I Section 3 in the 1972–75 agreement in the present case. The newspaper had planned to install a cold type process and then intended to go to scanning and on-line system. The impasse provision insisted upon by the newspaper thereafter provided that the jurisdiction of the union and the appropriate unit was defined as "including only those employees engaged in all work which the Employer may from time to time designate to be performed in the composing room . . . ." 625 F.2d at 959. The Tenth Circuit enforced the Board's order, determining that the company had improperly bargained to impasse. While recognizing that the transfer of work out of a bargaining unit is a mandatory subject which may be bargained to impasse, the court observed that the newspaper was not content to bargain merely on conditions of work but insisted instead upon the right to change unilaterally the scope of the unit itself. Although an earlier proposal of the Company here was similar to that before the Tenth Circuit,[6] the later impasse language which was actually in the final proposal of the Company clearly avoided that problem. By including the provision that "composing room work shall include work performed in the classifications of electronic technicians, Ad Make-up machine operators, Paste Make-up *and all other composing room employees*" the proposal under challenge here is saved from the fatal defect found by the Tenth Circuit. Members remain "composing room employees" and, thus, remain part of the unit regardless of whether all of the work is transferred to editorial employees or elsewhere.

---

**6.** The Company's initial proposal to the Union provided:

Jurisdiction of the Union and the appropriate unit for collective bargaining is defined as including all composing room work. Composing room work is further defined as that work which the Company may from time to time in its sole discretion assign to the composing room.

App. 29. The Company, however, did not bargain to impasse on this proposal, as it later submitted two other versions of the "Jurisdiction" clause, including the eventual impasse proposal presently at issue.

The Board suggests that in order to have avoided the difficulty the Company should have basically left unchanged the earlier jurisdictional description and modified it only with respect to specific job classifications. Ambiguities in the unit description, it urges, could then be left to the Board for clarification. While this was a potential solution, it in effect would have bound the Company to give up its rights to bargain concerning the work jurisdiction itself and would have prevented NPC from assigning work to other employees except at the price of potential arbitration following grievance. It was not improper, in our opinion, for the Company to clarify those jurisdictional questions in connection with the collective bargaining agreement and to bargain to impasse on that important issue.

■ Because the impasse proposal did not change the unit description as agreed upon in the 1972–75 contract, it was not unlawfully conditioned on a permissive subject of bargaining. In our opinion, the Company was not bound to retain endlessly and without change meaningless and outmoded jurisdiction language of the preexisting agreement. Although the 1972–75 agreement described the unit in terms of work performed, the Board and courts have clearly established that a bargaining unit description made in terms of job function does not by itself preclude the employer from changing employees' work assignments.

In *Univ. of Chicago v. N.L.R.B.*, 514 F.2d 942 (7th Cir. 1975), the University had transferred custodial work from one bargaining unit to another after bargaining to impasse over the transfer. The Board had held that the local union's recognition and descriptive clause had defined the specific area in which the employees would work. The Board found that the University thereby had unlawfully changed the recognition clause by transferring work to another unit. The Seventh Circuit disagreed. Retired Justice Clark, sitting as a Circuit Judge, stated that the bargaining history did not show that the University had ever agreed with the union as to a work assignment or a jurisdictional clause. Second, even though the recognition clause mentioned specific classifications and departments which the local would represent, this did not rise to the level of a jurisdictional clause prohibiting the transfer of work. Justice Clark then set forth a two-part test to govern transfers of work out of a bargaining unit:

> [U]nless transfers are specifically prohibited by the bargaining agreement, an employer is free to transfer work out of the bargaining unit if: (1) the employer complies with *Fibreboard Products v. NLRB* by bargaining in good faith to impasse; and (2) the employer is not motivated by anti-union animus....

514 F.2d at 949 (citation omitted). Both tests are clearly met here.

Similarly, in *Boeing Co. v. N.L.R.B.*, 581 F.2d 793 (9th Cir. 1978), the company had assigned certain "tack welding" work to non-union employees. The contract between Boeing and the union did not include a work assignment clause, but the bargaining unit was described as "[a]ll welders ... and including all employees operating machine welding equipment...." 581 F.2d at 794 n. 1. The Board found that Boeing had committed an unfair labor practice because the recognition clause implicitly guaranteed that Boeing would assign all welding work to the unions. The Ninth Circuit denied enforcement, stating:

> The Board in this case has misinterpreted a recognition clause in such a way as to impose on the Company a jurisdictional guarantee which was not bargained for by either party and which clearly did not appear in the [collective bargaining agreement]. For this reason, we deny enforcement of the Board's order.

581 F.2d at 796. In short, the court accepted, as do we here, the employer's argument that a recognition clause covers people and cannot be legally extended to cover functions so as to bar forever the Company's ability to negotiate concerning the proper assignment of those functions.

■ We believe that the following comment by the Board regarding unit certifica-

tion, quoted with approval by the Supreme Court, applies as well to voluntary recognition and places this dispute in the proper light:

"[A] Board certification in a representation proceeding is not a jurisdictional award; it is merely a determination that a majority of the employees in an appropriate unit have selected a particular labor organization as their representative for purposes of collective bargaining. It is true that such certification presupposes a determination that the group of employees involved constitute an appropriate unit for collective bargaining purposes, and that in making such a determination the Board considers the general nature of the duties and work tasks of such employees. However, unlike a jurisdictional award, this determination by the Board does not freeze duties or work tasks of the employees in the unit found appropriate. Thus, the Board's unit finding does not *per se* preclude the employer from adding to, or subtracting from, the employees' work assignments."

*Plumbing Contractors Ass'n,* 93 N.L.R.B. 1081, 1087, *quoted in Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 269, 84 S.Ct. 401, 407–408, 11 L.Ed.2d 320 (1964). Despite a unit description which is stated in terms of job function, as was the situation with the 1972 contract, an employer may transfer work from the union during the course of a collective bargaining agreement if there is no specific work assignment clause. Therefore, it necessarily follows that a unit description cannot prevent an employer from bargaining to impasse on a work assignment clause during the negotiations of a new collective bargaining agreement. This was all that the Company did here.

In conclusion, the record in the present case does not contain substantial evidence that the impasse proposal changed the actual description of employees represented by the Union. Thus, there was no violation of

the Act in this regard. The Company was within its rights under the Act to bargain to impasse on the work assignments and other conditions of employment and upon reaching impasse to proceed unilaterally to implement the changes in terms and conditions of employment.

Enforcement is denied.