860 F.2d 471
 129 L.R.R.M. (BNA) 2744, 273 U.S.App.D.C. 386,
110 Lab.Cas. P 10,818
 BOISE CASCADE CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Local 771, United Association of Journeymen and Apprentices
of the Plumbing and Pipefitting Industry of the
United States and Canada, et al., Intervenors.
LOCAL UNION 159, UNITED PAPERWORKERS INTERNATIONAL UNION, et
al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Boise Cascade Corporation, Intervenor.
 Nos. 87-1154, 87-1197.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 12, 1988.
Decided Nov. 4, 1988.
 
 Emery W. Bartle, with whom Mark B. Rotenberg, Minneapolis, Minn., was on the brief, for petitioner Boise Cascade Corp. in No. 87-1154 and intervenor Boise Cascade Corp. in No. 87-1197.
 William D. Watters, with whom Steven W. Schneider, Duluth, Minn., was on the brief, for petitioners, Local Union 159, United Paperworkers Intern. Union, et al. in No. 87-1197 and intervenors Local Union 771, United Ass'n of Journeymen, et al. in No. 87-1154.
 Patrick J. Szymanski, Attorney, N.L.R.B., with whom Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel and Peter Winkler, Supervisory Atty., N.L.R.B., were on the brief, for respondent, Elliott Moore, Paul J. Spielberg, and Margery E. Lieber, Attorneys, N.L.R.B., Washington, D.C., also entered appearances for respondent.
 
 
 1
 Before SILBERMAN and SENTELLE, Circuit Judges, and GREENE,* District Judge, United States District Court for the District of Columbia.
 
 
 2
 Opinion for the Court filed by District Judge HAROLD H. GREENE.
 
 HAROLD H. GREENE, District Judge:
 
 3
 These consolidated petitions for review, and cross-application for enforcement, require us to consider the validity of a National Labor Relations Board decision involving the Boise Cascade Corporation and eight unions at the company's facility in Minnesota. The Board found, first, that the company had violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1), (5) (1982),[1] when it insisted to bargain to impasse, and then unilaterally implemented, a proposal it had made with respect to its five maintenance unions,[2] and second, that the company had not violated the Act by demanding that three of its unions which represent only production workers[3] agree to the proposal relating to the maintenance unions. For the reasons explained below, we agree with the Board on both aspects of its decision. Accordingly we deny the petitions for review filed by the company and the production unions,[4] and we grant the Board's cross-application for enforcement.
 
 
 4
 * In 1965, Boise Cascade purchased a paper mill[5] in International Falls, Minnesota. At that time, and through 1984, the employees were divided into nine bargaining units,[6] each with its own collective bargaining agreement. Each contract contained jurisdictional provisions defining the work covered by the agreement and provided that this work would be performed only by employees operating under that contract. In the jurisdiction clause or in a separate paragraph, each contract also described the employees represented by the particular union. In 1984, Boise Cascade proposed the elimination of the jurisdictional rules so as to enable it to require employees in the various classifications to perform work outside their particular crafts. Specifically, the company bargained for the ability to assign maintenance employees to maintenance tasks entirely unrestricted by their unit designations.
 
 
 5
 These proposals were discussed for some period of time between the company and the unions. Subsequently, in the course of formal contract negotiations, Boise Cascade proposed the placement of all current maintenance employees into one of three broad new "general mechanic" categories: pipefitter, millwright, and electrical/instrument. The company proposal also would have eliminated all jurisdictional and unit description provisions, replacing them with a clause giving the company the unrestricted right to assign work to any employee.[7]
 
 
 6
 The unions stated in response that they were willing to discuss the company's interest in greater flexibility in the assignment of work, but they opposed the elimination of the existing unit descriptions and maintenance classifications.[8] Eventually, by a letter dated June 25, 1985, the company declared that the negotiations were at an impasse, it announced its intention to implement its final offer on July 1, 1985, and it did in fact unilaterally implement the offer on that date.
 
 
 7
 The Board's General Counsel filed and prosecuted an unfair labor practice complaint against the company before and administrative law judge; Boise Cascade took exception to the ALJ decision in favor of the unions; and the National Labor Relations Board, affirming the decision of the ALJ, found that the company had violated sections 8(a)(5) and (1) of the Act with regard to the five maintenance unions. The Board's order requires the company to cease and desist and to bargain with these unions,[9] and it orders the company to rescind any unilateral changes.[10]
 
 
 8
 The company contends, correctly, that the determination of whether a particular proposal is a mandatory subject of bargaining depends upon the application of the law to the facts, with the legal standard ultimately within the province of the courts. Ford Motor Co. v. NLRB, 441 U.S. 488, 495-97, 99 S.Ct. 1842, 1848-49, 60 L.Ed.2d 420 (1979); Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341 (1971). Nevertheless, where the Board's construction of the statute is "reasonably defensible," Ford Motor Co., supra, 441 U.S. at 497, 99 S.Ct. at 1849, and the Board's determination is supported by substantial evidence, we ordinarily defer to the Board's application of "the general provisions of the Act to the complexities of industrial life." NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). We find neither misconstruction of the law nor a want of substantial evidence in the case before us.
 
 II
 
 9
 It is well settled that the scope of the employees' bargaining unit is not a mandatory subject of bargaining. Cf. Shell Oil Co., 194 N.L.R.B. 988, 995 (1972), enf'd sub nom., OCAW v. NLRB, 486 F.2d 1266, 1268 (D.C.Cir.1973); Newspaper Printing Corp. v. NLRB, 625 F.2d 956, 963 (10th Cir.1980), cert. denied, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981).
 
 
 10
 It is the company's position that its proposal merely affected work assignments and jurisdiction--two subjects which are mandatory subjects of bargaining and which therefore may be bargained to impasse and implemented unilaterally by the company upon impasse. In the labor law context, jurisdiction[11] refers to the type of work the members of the union are to perform;[12] the scope of the bargaining unit is determinative of what employees the unit represents. The two concepts are not always easy to distinguish in practice and, in fact, under some of Boise Cascade's prior labor agreements, unit description and jurisdiction were combined in a single recognition clause. Nevertheless, whatever the difficulty, it is clear that an employer may not, "under the guise of the transfer of unit work ... alter the composition of the bargaining unit." Newport News Shipbuilding and Dry Dock Co. v. NLRB, 602 F.2d 73, 77-78 (4th Cir.1979).
 
 
 11
 The reasons why the law does not sanction a unilateral change by the employer in the scope of the bargaining units are as simple as they are fundamental. As the Board's General Counsel explained in an Advice Memorandum, unilateral changes in the unit description are unlawful first, because a union has a right to have its authority recognized in the collective bargaining agreement, and second, because the existence of a defined unit is a prerequisite to bargaining over terms and conditions of employment, for parties cannot bargain unless they know which employees a union represents. Beaver County Times, 99 L.R.R.M. 1726, 1727 (1978).
 
 
 12
 More basically, if an employer could vary unit descriptions at its discretion, it would have the power to sever the link between a recognizable group of employees and its union as the collective bargaining representative of these employees. This, in turn, would have the effect both of undermining a basic tenet of union recognition in the collective bargaining context and of greatly complicating coherence in the negotiation process. Once an appropriate bargaining unit has been established, the statutory interest in stability and certainty in bargaining obligations requires adherence to that unit. Shell Oil Co., supra. Indeed, the "parties cannot bargain meaningfully about wages or hours or conditions of employment unless they know the unit of bargaining." Douds v. International Longshoremen's Association, 241 F.2d 278, 282 (2d Cir.1957).
 
 
 13
 The Douds decision, by general agreement a leading authority on the subject of bargaining over unit scope, explained that this subject is a non-mandatory subject of bargaining because the parties must mutually understand which employees will be affected by their negotiations, and because to allow a party to insist upon a change in the scope of a bargaining unit would subvert the authority of the Board to make binding determinations regarding the appropriateness of bargaining units. 241 F.2d at 282-83. We agree with that reasoning. It follows that neither an employer nor a union has the unilateral power to modify the scope of the bargaining unit as determined by the Board, whether following bargaining to impasse or otherwise.
 
 III
 
 14
 With respect to the instant proceeding, the Board found that the company proposal, although it also affected work assignments and jurisdiction, in its essence effected an alteration of the scope of the bargaining units. That finding is plainly supported by the evidence.
 
 
 15
 Before the company implemented its maintenance proposal, each unit had its separate and individual identity. The units represented by the Pipefitters, the Electrical Workers, and the Machinists were craft units for these particular trades. The Teamster unit included all employees in a particular area, and the Woodworkers unit included the remaining maintenance employees in what was primarily a unit of production employees. According to the Board, these units were appropriate for purposes of collective bargaining: they allowed the employees in each unit effectively to exercise their right to bargain collectively through representatives of their own choosing.
 
 
 16
 The company measure eliminated the separate identities of these units for collective bargaining purposes. Under the new system, each maintenance union no longer represents any identifiable or cohesive group of employees, but only a percentage of one or more of the three maintenance categories. To be sure, each union retains the same proportionate share of the total number of employees,[13] so that, for dues-paying purposes none of the unions sustains a loss. But the payment of dues is not the issue. The issue is whether the requisite link remains between a recognizable group of employees and a particular union. Under the company proposal, the identity of the employees in each of the five unions can change periodically and at very brief intervals. As the company's chief negotiator conceded, under that proposal an employee might have to transfer from union to union on a monthly basis.[14]
 
 
 17
 Even if the employer had proceeded by petitioning the Board for unit clarification under the Board's rules, as the Board suggested in its opinion, see Decision of Administrative Law Judge at 13, J.A. at 21, it is clear that Boise's proposed bargaining units would have been declared inappropriate under the Act.[15] Significantly, as established by the company proposal, the three new units share no distinct community of interests, and they are plainly inappropriate on that basis as well. Western Newspaper Publishing Co., 269 N.L.R.B. 355, 363 (1984). These units represent neither all the employees engaged in their respective crafts nor all the employees in any one category.[16] Instead, they have in effect become the joint representatives of the mass of employees, with none of them having status as the exclusive representative of any particular group. That is improper under the Act, OCAW v. NLRB, supra, 486 F.2d at 1268 & n. 14, for no genuine bargaining could take place in that context. McQuay-Norris Mfg. Co. v. NLRB, 116 F.2d 748, 751 (7th Cir.1940).
 
 
 18
 On any view of the matter, then, the company's proposal directly affects the employees' right to representation. The company reserves to itself complete control over the assignment of the work, and because under the proposal the work determines the placement, from time to time, of particular employees into one or the other of the three new maintenance categories, the company also controls union membership. At least in theory, and very likely in practice, the company's work and employee assignments have the effect of transferring employees from one union to another as the assignments change. See Newspaper Printing Corp. v. NLRB, 692 F.2d 615, 621 (6th Cir.1982) (observing that "fatal defect" of employer proposal is creation of linkage between transfer of work and membership in bargaining unit).
 
 
 19
 In sum, under the company's proposal, any particular union represents some, but not all, the employees in the three maintenance job classifications; and no union is the exclusive bargaining agent for employees in these classifications. The company has not cited a single decision of any court or of the Board that has sanctioned such a scheme.
 
 
 20
 These principles are not impaired by the two decisions principally relied upon by the company. The company argues that this Court has sanctioned the unilateral implementation of a proposal to establish complete interchangeability with respect to categories of employees and their work assignments, citing Taft Broadcasting Co., 163 N.L.R.B. 475, 477-78 (1967), aff'd sub nom., AFTRA v. NLRB, 395 F.2d 622 (D.C.Cir.1968). Taft, however, dealt strictly with one employer and one union; hence, there was no threat to union integrity as a result of the employer's muddling of bargaining units. Indeed, the union's complaint in Taft focused on the circumstances under which the unilateral changes were announced or instituted--whether there was impasse and adequate notice to the union--not on the issue whether the changes involved a non-mandatory subject of bargaining, as in this case.
 
 
 21
 The company also argues, relying upon Newspaper Printing Co. v. NLRB, supra, that jurisdictional clauses concern the assignment of work to union members and are mandatory subjects of bargaining. True enough. However, the Sixth Circuit in that case made it crystal clear that although the parties may "by mutual consent" bargain concerning the scope of the bargaining unit, "it is a violation of section 8(a)(5) of the Act for one party or the other to bargain to impasse ... on such a subject." 692 F.2d at 620. The court sustained the company's position in that case only because the combined jurisdiction/unit description clause was "almost ... identical" to that contained in the previous agreement and because the company "was careful to preserve the unit description while changing the jurisdiction clause about which it had a right to bargain to impasse." 692 F.2d at 620-21.
 
 IV
 
 22
 Boise Cascade also claims that its proposal is justified because the Minnesota plant is inefficient, a state of affairs allegedly produced in part by obsolete maintenance job classifications and narrow work assignment limitations. These conditions, it is said, endanger the continued viability of the mill. The company insists in this connection that it did not intend to injure the union but was motivated solely by a desire to improve the efficiency of the plant, citing Fibreboard Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), as sustaining its position that, in such circumstances, it could unilaterally effect changes in unit scope. There are several problems with that argument.
 
 
 23
 In the first place, the Supreme Court did not hold in Fibreboard that a company's purpose to achieve efficiencies, as distinguished from an antiunion animus as a motivating force, protects it from being found in violation of the Act. To the contrary, the Court referred with evident approval to the Board's conclusion that a company could be in violation of section 8(a)(5) of the Act even though its "motive in contracting out its maintenance work was economic rather than antiunion...." 379 U.S. at 208, 85 S.Ct. at 401. Indeed, it has been held several times since the Fibreboard decision was rendered that intention is irrelevant, and that good faith is not a defense to an insistence to impasse on a non-mandatory subject of bargaining. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958); Newspaper Printing Corp. v. NLRB, 625 F.2d 956, 963 n. 13 (10th Cir.1980), cert. denied, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981).
 
 
 24
 That is, of course, the crux of the matter--whether the issue between the parties does or does not represent a mandatory subject of bargaining. The Court in Fibreboard concluded that the particular type of contracting out there involved was a mandatory subject of bargaining, and that the company therefore was not free to refuse to confer in good faith with respect thereto. Boise Cascade's unilateral action in this case is improper for a different reason. As the discussion in Part II, supra, demonstrates, the issue of the scope of the bargaining units is a non-mandatory subject of bargaining. As such, and because the subject matter is not within the control of the company, it may not be implemented by unilateral fiat of the company upon its declaration of an impasse or otherwise.[17]
 
 
 25
 For these reasons, we hold that the National Labor Relations Board was correct in holding that Boise Cascade violated sections 8(a)(1) and (5) of the Act.
 
 V
 
 26
 Three production unions, which have no members who are maintenance employees, assert that the Board erred in dismissing the complaint insofar as it relates to them.[18] The Board dismissed the union's petition for review based upon its finding that the company had not insisted upon agreement by the production employees to the maintenance modernization proposal, and that these employees were free to have signed an agreement without the inclusion of the maintenance proposal. That finding is clearly supported by substantial evidence.
 
 
 27
 As the production unions themselves acknowledge, the proposed agreement offered by the company in 1985 stated that "this Agreement is a separate document for each of the Unions."[19] More, in contrast to the assertions made by these unions that Boise Cascade wanted a single contract, the company informed the unions that it planned to sign separate agreements with them; its final settlement memorandum offer referred to acceptance by each union individually; and that offer specifically provided that the resulting agreement would be "a separate document for each of the Unions."[20]
 
 
 28
 The practice of the company and the unions prior to 1985 was that, although bargaining was done by using a joint memorandum, ultimately each union entered into a separate agreement with the company, including only those provisions of the joint memorandum to which it had agreed. The production unions also acknowledge, as they must, that the company's chief negotiator stated, without contradiction, that these unions knew that they could have signed contracts without agreeing to the provisions relating to maintenance modernization and the related unit recognition provisions.[21] In short, the Board had ample support for its conclusion that the complaint had to be dismissed insofar as it related to the production unions.
 
 
 29
 For the reasons stated, the petitions for review are dismissed and judgment is entered granting the Board's application for enforcement of its order against Boise Cascade.
 
 
 30
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with the employees' right protected by section 7 "to bargain collectively through representatives of their own choosing." Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." According to section 9(a), "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes" are the exclusive representatives "of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."
 
 
 [2]
 Five unions are referred to as the maintenance unions because the bargaining units they represent include maintenance workers. They are Local 771, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; Local 4-33, International Woodworkers of America; Chauffeurs, Teamsters and Helpers Local 346; Local No. 731, International Brotherhood of Electrical Workers; and International Association of Machinists, Lodge No. 760
 
 
 [3]
 The three unions which have only production or non-maintenance employees as members are Local Union 159, United Paperworkers International Union; Local No. 49, United Paperworkers International Union; and Local No. 50, International Union of Operating Engineers
 
 
 [4]
 The five maintenance unions intervened to support the Board's decision in their favor, and the company intervened on behalf of the Board in respect to the production unions' petition for review
 
 
 [5]
 The facility also included an insulite plant and a rail yard
 
 
 [6]
 One of the nine units is subject to the Railway Labor Act and is therefore not involved in this litigation
 
 
 [7]
 The company's proposal, as implemented, totally replaced the varied unit descriptions included in the collective bargaining agreements with its own description of the units
 
 
 [8]
 A number of other issues were also between the parties, but they are of no relevance of this litigation
 
 
 [9]
 Section 8(d) of the Act defines collective bargaining as the obligation of the employer and the union to meet and to confer in good faith "with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. Sec. 158(d). All of these are mandatory subjects of bargaining, and neither side is legally obligated to yield its position with respect thereto. NLRB v. Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823, (1958). As the Supreme Court said in that case, "it is lawful to insist upon matters within the scope of mandatory bargaining and unlawful to insist on matters without...." Id
 
 
 [10]
 The Board order also requires the company to make the employees whole for any loss suffered as a result of the changes and to post an appropriate notice
 
 
 [11]
 The term "work assignments" is of course self-explanatory
 
 
 [12]
 Jurisdiction clauses concern the assignment of work to union members. Newspaper Printing Corp. v. NLRB, supra, 625 F.2d at 964-65. The issue whether and the extent to which an employee may be made to work in an area related to his primary assignment is also regarded as one of jurisdiction
 
 
 [13]
 This is so regardless of changes in the total number of employees in each of the three new classifications or the reasons for such changes
 
 
 [14]
 The company maintains that each union continues on the day following implementation of the proposal to represent the same employees it had always represented. While that is true, the company's argument does not hold for the second day or the day after that, for under the company's scheme, as employees in one maintenance category are hired or terminated, some employees assigned to that category will be forced to change their union affiliation in order for each union to maintain a fixed proportion of members. Consequently, each union will represent an ever-changing roster of individuals who have otherwise nothing in common
 
 
 [15]
 In the Board's order under review, the Board observed that petitioner Boise Cascade "could certainly have proceeded by initiating a petition for unit clarification under section 102.60(b) of the Board's rules and regulations." See 29 C.F.R. Sec. 102.60(b). We admit some doubt, however, as to whether petitioner could have achieved precisely the results it sought under the proposal at issue in such a proceeding. There is substantial Board precedent supporting the notion that there must exist relevant, recent changes in the employer's operations and in pertinent job classifications before the Board will consider a unit clarification petition appropriate. See, e.g., Union Elec. Co., 217 N.L.R.B. 666, 667 (1975); see also NLRB v. Magna Corp., 734 F.2d 1057, 1061 (5th Cir.1984). It seems likely, therefore, that the employer would have had to negotiate some changes in work assignment and jurisdiction before petitioning for unit clarification. Nevertheless, the question before us is whether the Board's conclusion that the employer's insistence went beyond work assignment and jurisdictional matters into the realm of unit scope is supported by substantial evidence. This we answer in the affirmative, despite any lingering confusion over the scope of unit clarification proceedings before the Board
 
 
 [16]
 The employees fitting these three categories may, under the proposal, be assigned in varying percentages to membership in each of the five maintenance unions. For example, the existing Teamster Unit would initially receive 4% of the employees classified as General Mechanic/Millwright, 6% of the employees classified as General Mechanic/Pipefitter, and 22% of the employees classified as General Mechanic/E & I. J.A. at 363
 
 
 [17]
 A recognition clause therefore does not become invalid or immune from unilateral company extinction following impasse merely by labelling it "obsolete," "lifeless," or "confusing." Brief of Petitioner Boise Cascade Corporation at 30-32
 
 
 [18]
 The complaint alleged violation by the company of sections 8(a)(5) and (1) for demanding "as a condition of agreement and execution of any collective bargaining agreement with any of the Unions, that the Unions collectively agree."
 
 
 [19]
 Brief of Local 159 at 8
 
 
 [20]
 Brief of the NLRB at 26
 
 
 [21]
 Brief of Local 159 at 10