The UNIVERSITY OF CHICAGO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 74–1392.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1975.

Decided April 24, 1975.

Richard L. Marcus, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Robert A. Giannasi, Asst. Gen. Counsel and Howard E. Perlstein, Atty., National Labor Relations Bd., Washington, D. C., for respondent.

Before CLARK, Associate Justice,* SWYGERT and CUMMINGS, Circuit Judges.

Mr. Justice CLARK:

Petitioner, The University of Chicago, seeks review of an NLRB order,[1] which found that it violated Section 8(d) and derivatively Sections 8(a)(1), 8(a)(2), and 8(a)(5) of the Act[2] when, during the

---

\* Associate Justice Tom C. Clark, United States Supreme Court (Ret.), is sitting by designation.

1. Reported at 210 NLRB No. 19 (1974).

2. The Act provides in 29 U.S.C. § 158 as follows:

(a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

term of a collective bargaining agreement, the University transferred custodial work from one bargaining unit (Local 321) to another (Local 1657) after bargaining to impasse over the transfer.

Bottoming its decision on the lengthy opinion of the Administrative Law Judge, the NLRB held that the practice of the University in allocating cleaning areas between the two locals "was an inextricable, albeit inexplicit, part of the bargaining history that led up to the University's contract with Local 321 and was necessarily embodied in the contract's recognition clause," and concluded that the workplace assignment customarily performed by Local 321 could not be reassigned to be performed at the same location by the University's own employees represented by a different union. We can find no support for this novel theory either in the "bargaining history" of this case or in any legal precedents. In our view, the effort of the Board to thus read a jurisdictional guarantee into a recognition clause seriously impinges upon the fundamental rights of management and requires reversal.

The Board, as well as the Administrative Law Judge, appears to have totally ignored the real grounds on which the University predicated the transfer and has stretched to discredit the employer's decision by ascribing the work transfer to a mere desire to cut down pay rates. We are therefore obliged to trace the history of this controversy in a more detailed manner than would otherwise be necessary.

### I.

The University of Chicago is a private university whose 8,000 students matriculate in either professional schools or academic divisions. This case involves the Biological Sciences Division (hereafter the "BSD") organizationally the largest academic division. The BSD is comprised of both nonclinical academic departments, such as Botany and Zoology, and clinical departments, such as Surgery and Medicine, where students seeking an M. D. degree receive most of their instruction, since the University has no separate, formal "medical school". The BSD also administers the University of Chicago Hospitals and Clinics.

The clinical departments of the BSD are all housed in the University of Chicago Hospitals and Clinics, a labyrinth of about eleven inter-connected buildings. Some of the buildings are conventional hospitals devoted largely to patient care; others principally contain classrooms, laboratories, libraries, offices, and research facilities and still others serve a dual role. Patient care areas and academic facilities in the complex abut each other at certain points.

The University employs about 7,500 persons in such non-academic pursuits as building maintenance; housekeeping and food service in residence halls, hospitals, and clinics; and custodial work in various campus buildings. For the past 25 years, the University has maintained a collective bargaining relationship with Local 1657, American Federation of State, County, and Municipal Employees' Union, AFL–CIO, for a bargaining unit covering approximately 900 employees scattered throughout the University. For the same period, the University has also maintained a collective bargaining

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract . . . .

relationship with Local 321, College, University, and School Employee's Union AFL–CIO for a unit covering approximately 300 employees equally scattered throughout the University.

Prior to September 1, 1971, both Local 321 and Local 1657 represented custodians who cleaned and maintained the hospital complex. Nineteen of the three hundred Local 321 employees provided janitorial services in certain areas of the hospital complex. These few custodians originally were under the supervision of the University-wide Plant Department, even though the Plant Department is a separate administrative entity generally charged with the service and maintenance of all University structures other than the hospital complex. However, since 1965 these Local 321 custodians working in the hospital complex were actually supervised by personnel from the Biological Sciences Division rather than the Plant Department. For budget purposes, the compensation for these custodians was included within the Plant Department's budget and then reallocated to the BSD by an annual interdepartmental fund transfer.

The Local 321 custodians maintained most but by no means all, nonpatient areas. In these areas, they were responsible for wet-mopping classrooms, offices, laboratories, and corridors, picking up glass and other debris, emptying wastebaskets and ashtrays, and stripping and waxing of floors. They did not wash walls, clean any hospital rooms, operating rooms or other areas devoted principally to the immediate treatment of clinical patients.

All other areas in the hospital complex, including patient and nonpatient areas, were cleaned by Local 1657 custodians. These 182 custodians, however, were supervised by the General Services Department, an administrative department devoted primarily to janitorial duties within the hospital complex.

It is undisputed and the ALJ so found that the Local 1657 custodians performed a higher quality of cleaning and maintenance than did Local 321 custodians.

Local 1657 employees washed walls, used germicidal detergents, and wet-mopped with far greater frequency than did Local 321 personnel. Many of the areas maintained by Local 1657 members were principally devoted to patient care, and therefore all areas maintained by Local 1657 were kept at a much higher degree of cleanliness than those offices, classrooms and other areas cleaned by Local 321 employees.

As stated previously, from time to time the University would relocate certain offices or laboratories, a fact which hindered attempts to distinguish the two units on a clincal-non-clinical basis. On one occasion, when the University desired to utilize Local 1657 employees to clean areas then maintained by Local 321 employees, it engineered a swap between the two locals of certain cleaning areas so that no loss of work was occasioned by either as a result of the changeover. For the most part, the University utilized certain benchmarks, such as a doorway or an archway, to delineate the boundaries of the two groups' respective cleaning responsibilities.

The Administrative Law Judge found that:

[I]t was not challenged, that the Dean's Office of BSD had, over a period of time, received an accumulation of complaints, coming principally from the medical faculty, to the effect that the portion of the medical-academic complex cleaned by Local 321 employees was inadequately maintained. The complaining physicians expressed a continuing desire to have all portions of the BSD maintained to the same level of cleanliness that existed in the patient-care sections.

Since about 1948, the University has recognized Local 321 as the collective bargaining representative of the non-patient care area custodians, among other employees in a University-wide unit, and many contracts have been negotiated. On September 1, 1970, a two-year collective bargaining agreement was entered into which in relevant part provided:

## ARTICLE II

### RECOGNITION

Section 2.1. The University recognizes the Council [which includes Local 321] as the exclusive collective bargaining agency for all employees . . . who are employed in the following classifications and departments:

A. Service and maintenance classifications in the Plant Department . . .

No mention was made in this or any previous contract of the nineteen Local 321 custodians in the hospital complex since they were regarded as technically still being within the Plant Department. The recognition clause between Local 1657 and the University covered, *inter alia*, "General Services . . . employees in the Hospitals and Clinics."

In early 1971, the Plant Department's budget was cut and a number of employees in the department were accordingly laid off. In order to accommodate the Union's desire to protect the nineteen Local 321 custodians from being bumped by other Plant Department employees displaced from their positions at other University sites, the University and Local 321 on May 7, 1971, added a new classification to the recognition clause of the existing contract, namely, "Janitors in the Biological Sciences Division", and also added to the contract a provision calling for departmental rather than unit-wide seniority in the Local 321 unit.

Subsequently, due to the nearly complete functional and geographical integration of patient-related functions and non-patient-related functions, the practice of attempting to limit the duties of the nineteen Local 321 custodians to essentially non-patient areas resulted in their assignment to disparate and often isolated portions of the hospital complex. With the exception of one building cleaned by five of the nineteen Local 321 custodians, no structure within the hospital complex was ever cleaned solely by either General Services Department or Plant Department personnel. In some cases, the division of cleaning functions was based only upon geographic demarcation. In some areas geographical distinctions between the areas cleaned by the two groups of custodians defied rhyme or reason. On some floors, one of the two groups would clean an entire corridor and the adjacent rooms. On some floors, personnel from one group might clean a portion of the corridor while employees from the other group cleaned the adjacent offices. On other floors, the employees from one group would clean a portion of a corridor up to a point with the personnel from the second group cleaning the balance of the corridor and adjacent offices. Also, the area cleaned by each of the two groups of employees fluctuated from time to time.

On July 9, 1971, Fred Bjorling, the University's Director of Personnel, informed David Sullivan (then Secretary-Treasurer of Local 321) by letter that the University "was experiencing organizational difficulties stemming from the maintenance of the Hospital's complex by two bargaining units of janitorial employees"; that the University desired "to raise the level of sanitation in the portions of the buildings then being cleaned by Local 321 members"; and that since "the level of cleaning for much of the area must be at a hospital level of sanitation and because the General Services Department does the great bulk of the cleaning in the medical complex now, the only possible solution appears to be to transfer all the Medical School cleaning in the Hospitals to the General Services Department." The letter pointed out that such a transfer would reduce the Local 321 unit by fourteen positions, and closed by advising "should you desire to confer with us about these contemplated changes, please notify me." Sullivan asked for such a meeting and one was held on August 13, 1971, at which time the matter was discussed at some length.

With reference to improving the level of cleaning, Sullivan asserted that "he was sure that, with the proper training, his members could perform satisfactorily at any level of cleaning desired . . ." A few days later, Sullivan advised the

University that he had consulted with his attorney and was told that "the University could not legally take the acion it had outlined in the July 9 letter". Bjorling answered that he believed that the University could legally take the steps indicated "and that it would probably do so", but promised to keep the union posted. On August 13th, the University wrote another letter to Sullivan, outlining in full its tentative plan and stating there was "no feasible alternative" to implementing the changes. On August 18 representatives of the Union and the University met to talk over the implementation of the University's decision, including the order of lay-off and the bidding by displaced Local 321 members for new jobs in the expanded Local 1657 unit. It was then that Sullivan told the University representatives: "We are not going to fight you on this thing," indicating that his basic desire was to make "the best deal possible".

Another meeting was held on August 21st, and was punctuated by some heated exchanges, one Local 321 custodian complaining that the job duties in the Local 1657 unit were more demanding than those performed in the Local 321 unit. At a final meeting on August 23rd, attorneys for both parties were present, and Local 321 objected to the changeover, asserting that it had legal grounds to block the University's action. On August 30, 1971, the charge in this case was filed.

The University proceeded with the transfer. As a result, fourteen Local 321 employees were laid off. Twelve of these were offered and accepted jobs in the Local 1657 unit. The other two were also offered jobs, but they declined them and elected to go on layoff instead. The University proceeded with the layoff and reorganization as scheduled. Simultaneously, Local 1657 members began cleaning the non-patient care areas of the BSD complex formerly cleaned by Local 321's janitors. It does not appear that any of the twelve Local 321 janitors were assigned to their old jobs although they continued to perform the same type of work in the BSD Hospitals complex. Five of the original Local 321 custodians working in the one totally nonpatient building in the complex were not affected by the transfer. They remain to this day in the Local 321 unit as Plant Department employees supervised by BSD personnel.

Of the twelve "transferred" janitors, three received approximately the same wages as before, but the other nine suffered reductions of from a few cents per hour to eighty cents per hour because they were assigned to labor grades whose wage rates were lower under Local 1657's agreement. All were required to join and pay dues to Local 1657 since its contract contained a union security clause.

The ALJ concluded that following the changeover:

> The General Services Department reduced the uniform standard of cleaning it had previously maintained throughout those areas which were subject to its responsibility for the portions of the Hospitals complex which housed the medical school. The University maintains, without contradiction, that the standard of cleaning, while reduced when measured by General Services Department standards, was, and is, superior to the standard of cleaning previously applied by Local 321 members before the changeover.

## II.

■ The Board, as we have indicated, held that the recognition clause of Local 321's contract necessarily included the specific cleaning areas in the BSD complex in which its members worked and that, by transferring the work, the University repudiated both the recognition clause and the terms and conditions of employment of its members in violation of Section 8(a)(5) and (2) of the Act; and that by requiring Local 321 members to join and pay dues to Local 1657 the University rendered unlawful assist-

ance to that union in violation of Section 8(a)(5) and (1) of the Act.[3]

In concluding that the allocation of cleaning areas was an "inextricable, albeit inexplicit, part of the bargaining history", the Board appears quite "inexplicit" itself in delineating the basis for its unusual conclusion. While it asserts in its brief here that "the evidence indicates that the University agreed to assign certain work to specific employees and recognize their union", the Board fails to point out what evidence supports such an indication, and in its "Decision and Order" no such claim is mentioned, much less supported. The reason for this failure is clear: There is no evidence in the record that even "indicates" such a finding.

The Administrative Law Judge treats certain language in the contract, i. e. the addition on May 7, 1971, of "Janitors in the Biological Science Division" to the enumeration of classifications and departments covered in the recognition clause, as if it were a jurisdictional clause, prohibiting the transfer of work. We fail to understand how such language can be so interpreted. The Board concedes in its brief that the addition to this clause was intended, in the Board's own words, "solely to insulate these BSD employees from their imminent job loss and bumping due to a layoff in the Plant Department." The recognition clause itself has appeared in successive agreements for 23 years, and no such claim was ever made despite many transfers of work from Local 321 as well as Local 1657.

■ To support its position, the Board contends that there was an agreement "to assign specific work to a specific group of . . . employees for the duration of the collective bargaining agreement, *as shown by the bargaining history*." (Emphasis supplied) But, as we read the record, the "bargaining his-

tory" is barren of a single word of evidence that demonstrates that either party mentioned or even indicated that the enumeration of classifications and departments was made in order to confer jurisdictional rights on Local 321 or to designate permanent areas to which work would be assigned to Local 321 custodians. The only "bargaining history" to which the Board can refer is to past practice and that can hardly be elevated into jurisdictional rights. In fact, even past practice did not give "the job of cleaning of all non-patient care areas" in the buildings involved to Local 321 custodians. At least half of the non-patient areas have been cleaned by Local 1657 custodians. The record clearly shows no definite line of demarcation. With the exception of one building that was cleaned by five of the nineteen Local 321 custodians, no structure within the hospital—academic complex was ever cleaned solely by the custodians of either union. In fact there was no clearly defined past practice.

■ Even if Local 321 custodians had always held identifiable assignments, however, it would not follow that the University is deprived by its past practices alone from transferring the work to others. The contract itself does not so provide nor has any case so held in any court. The Board cites two cases in support of its order denying the University the right to transfer its work, but in our view neither is apposite. The first, Office and Professional Employees Union, Local 425 v. NLRB, 136 U.S.App.D.C. 12, 419 F.2d 314 (1969), focused on the failure of the employer to bargain at all; here, of course, the University admittedly bargained to impasse. The second case, NLRB v. United States Air Conditioning Corp., 302 F.2d 280 (1st Cir. 1962), focused on the presence of clear anti-union animus on the part of the employer; here there is nothing whatsoever in the record to suggest such animus.

---

**3.** The Board affirmed the rulings, findings and conclusions of the Administrative Law Judge but made no reference to his alternative ground supporting the violations, i. e., that the literal language of the May 7, 1971 addendum

to the bargaining contract, which recognized Local 321 as the bargaining agent for "Janitors in the Biological Sciences Division", "covers both the work and the employees here in question."

■ As we read the cases, unless transfers are specifically prohibited by the bargaining agreement, an employer is free to transfer work out of the bargaining unit if: (1) the employer complies with Fibreboard Paper Products v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), by bargaining in good faith to impasse; and (2) the employer is not motivated by anti-union animus, Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). The Board concedes that the University bargained in good faith with Local 321 in advance of its decision to transfer the work. Furthermore there is no contention and certainly no evidence that the University's decision to transfer the work was motivated by anti-union animus. It is plain that the sole reason for the decision to transfer the work was the necessity to raise the level of sanitation in the medical-academic complex in keeping with the high standards demanded by the University's professional staff. Over many years, Local 321 custodians had concededly performed at a lower standard than that desired and admittedly were unable to improve without further training. Local 1657's personnel, on the other hand, furnished the highest standard of sanitation and were in a position to extend and enlarge their services to include the adjacent areas formerly serviced by Local 321 custodians. In this day of concern for public health and safety, what higher motives could there be? To attribute without real proof the work transfer to the savings of a few paltry dollars is but to wrong the University.[4]

The Board raises the spectre that "contracts could be eviscerated at the employer's will", if the transfer in this case is not struck down. We, however, do not envision unions being picked apart piece-by-piece in total defiance of the statutory policy to stabilize labor agreements. That is not what occurred in this case, and that will not happen so long as the National Labor Relations Board sits and performs the solemn function that the Congress has assigned to it. The order to enforce is

Denied.

---

4. Furthermore, to uphold the Board in this case would lead to an unnecessary interference in the management process. The Board says that it matters not which University department supervises the performance of the employees. "What is essential," it asserts, "is that the former Local 321 unit performs the work in the areas in question." Such a directive could only lead to chaos, for if Local 321 custodians were placed under the General Services Department, they would collide with the members of Local 1657, which is the representative of the General Services employees. Thus the equating of recognition with jurisdictional clauses will only compound the confusion.