NATIONAL LABOR RELATIONS
BOARD, Petitioner,

Seafarers International Union of North
America, Atlantic, Gulf, Lakes and In-
land Waters District, AFL–CIO, Inter-
venor,

v.

McALLISTER BROTHERS, INC. and
Outreach Marine Corporation, Alter
Egos, Respondents.

No. 86–3860.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 6, 1987.

Decided May 20, 1987.

Kenneth A. Margolis (Dretzin & Kauff,
P.C., New York City, Ober, Kaler, Grimes
& Shriver, on brief), for respondents.

Richard A. Cohen, N.L.R.B. (Rosemary
M. Collyer, Gen. Counsel, John E. Higgins,
Jr., Deputy Gen. Counsel, Robert E. Allen,
Associate Gen. Counsel, Elliott Moore, Dep-
uty Associate Gen. Counsel, Howard E.
Perlstein, Supervisory Atty., Washington,
D.C., on brief), for petitioner.

James M. Altman (Schulman & Altman,
New York City, on brief), for intervenor.

Before WINTER, Chief Judge,
SPROUSE, Circuit Judge, and
MERHIGE, United States District
Judge for the Eastern District of
Virginia, sitting by designation.

SPROUSE, Circuit Judge:

The National Labor Relations Board peti-
tions for enforcement of its order finding
that McAllister Brothers, Inc., (MBI) and
Outreach Marine Corporation are alter-ego
enterprises, and that the two companies
committed unfair labor practices when they
unilaterally discharged their Union[1] em-
ployees and otherwise failed to honor their
obligations under the employees' collective
bargaining agreements. 29 U.S.C.

---

1. The Seafarers International Union of North
America, Atlantic, Gulf, Lakes and Inland Wa-
ters District, AFL–CIO.

§§ 158(a)(1), (3), (5). MBI and Outreach contend that the Board misapplied controlling legal principles and that the evidence fails to support the Board's conclusions. We disagree, and grant enforcement of the Board's order.

## I.

### A. MBI's Structure

MBI is the Baltimore subsidiary of McAllister Brothers Towing and Transportation Company (MT & T), a major tugboat operator that provides tugboat services to vessels in the four principal Eastern Seaboard ports of New York, Philadelphia, Norfolk, and Baltimore. In 1980 MBI commenced operations by purchasing another Baltimore tugboat company, adopting its labor force, and assuming its collective bargaining obligations. The majority of MBI's work in Baltimore Harbor consisted of docking ocean-going vessels that utilized MT & T services when they called at the ports of New York, Philadelphia, and Norfolk.[2]

MBI's Baltimore management consisted principally of Assistant General Manager Rollins Bishop, Operations Manager and Chief Dispatcher Richard Gross, and Dispatchers John Franey and Edward Johansen. Since MBI's President, Anthony McAllister, and its Vice-President, Donald Stephens, worked out of MT & T's Philadelphia headquarters, Rollins Bishop had overall operational responsibility for the Baltimore operation. Richard Gross, however, was the highest ranking management official who maintained routine contact with MBI's rank-and-file employees. Gross, along with the other dispatchers, drafted the employees' work schedules, assigned crews, resolved scheduling conflicts, and authorized time off for employees requesting it. Gross also represented management at monthly grievance meetings with the Union and had the authority to discipline or discharge MBI employees.

In 1981, MBI and the Union executed new collective bargaining agreements effective through September 30, 1984. MBI's labor obligations extended to two bargaining units of shipboard personnel, each covered under a separate contract. The first unit was composed of licensed workers only—captains, mates, and engineers. The second unit included all unlicensed shipboard employees—primarily deckhands. The agreements described the various job responsibilities of each crew member,[3] and contained provisions governing work assignment, layoff, recall, base and premium pay rates, various workweek guarantees, and other fringe benefits for each of the defined job descriptions.[4]

### B. MBI's Unprofitable Operation

From its inception, MBI realized that its Baltimore Harbor service would in all probability be a losing venture.[5] To reach the break-even point, MBI calculated that it would have to reduce operating expenses to the lowest possible level and increase its Baltimore market share twenty-five percentage points over the twenty-percent share it obtained when it purchased the

2. By establishing MBI in Baltimore, MT & T acquired the ability to serve its customers in each of the four major Eastern Seaboard ports. Four-port presence was an attractive sales feature because most ships docked at each of the ports and their owners preferred to contract with a single company for all of their tugboat needs.

3. The captains' principal duty was to plan docking operations and direct the tugboat during the operation from the helm of the ship to be docked; the mates' primary responsibility was to navigate and steer the tugboat, particularly during towing and docking operations; the engineers operated, maintained, and repaired the tugboats' machinery; the deckhands were responsible for cleaning the tugboats and handling the lines used in the towing and docking procedures.

4. In addition to contractual wage rates, the captains also received "docking pilot fees" from the owners of the ships they docked. MBI billed its customers directly for its captains' pilot fees and then remitted the amounts received to the captains. Approximately one-third of each captain's annual income was derived from these fees.

5. This was due, at least in part, to the high cost of labor. MBI's labor costs amounted to approximately fifty percent of its total annual operating expenditures.

predecessor tugboat company. Despite considerable efforts, which included reducing its clerical staff, freezing wages and salaries of nonunion personnel, and a failed attempt to raise its harbor tariff rates, MBI experienced a $250,000 operating loss in 1981, an even greater loss in 1982, and a projected loss for 1983 of $750,000 on total revenues of $3,000,000.

In the Fall of 1983, facing a projected $750,000 loss, MBI decided that it must reduce its Union labor expenses. At a meeting with its Union employees, MBI President Anthony McAllister distributed a written proposal calling for a fifteen-percent wage and benefit reduction, a waiver of scheduled wage increases, and other concessions. After examining the company's books, however, the Union advised MBI that it would not agree to the proposal, but would instead offer the company a low-interest loan to help it meet its cash-flow needs. MBI rejected the Union's loan, suggesting that the employees purchase the company outright. In this context, MBI distributed a purchase proposal in which it offered to sell the employees four of the company's five tugboats for $1,900,-000. MBI further offered, in return for a flat fee, to act as the employees' "sales agent," using its best efforts to generate $3,000,000 in annual revenues. Finally, MBI represented that if the employees rejected the buy-out proposal, it would search for another purchaser.

## C. The Sale Transaction

Prior to receiving a formal response from the employees, MBI approached an outside buyer for the sale of the company. The buyer, Alcide Mann, was a former MT & T general manager. Although he had considerable experience in the maritime industry, Mann had never owned his own business and did not possess the financial resources needed to purchase MBI. Never-

theless, Mann agreed to buy the company on terms nearly identical to those MBI had offered the employees.

In early January 1984, Mann incorporated Outreach Marine Corporation in Maryland for the purpose of acquiring MBI's four tugboats. In a letter to the National Westminister Bank, USA, a New York financial institution that Mann had previously contacted regarding a proposed loan,[6] Mann related that Outreach intended to operate the tugs primarily in ship-docking service in Baltimore Harbor, and that Outreach would obtain a five-year renewable agency agreement from MBI to perform work for MBI's customers. In a subsequent letter, Mann sent the bank financial projections for Outreach's planned operations. The projected labor costs listed in his correspondence were lower than those experienced by MBI under its collective bargaining agreements.

Between mid-January and April 1984, MBI advanced Outreach $42,500 in interest-free loans to provide it with start-up capital. MBI permitted Mann to retain $10,000 of this money as compensation for an initial $10,000 investment he had made into Outreach.

On March 1, 1984, the Westminister Bank issued a loan commitment to Outreach for $1,400,000 of the $1,900,000 purchase price for MBI's tugboats. Mann and his wife, along with MBI and MT & T agreed to act as co-guarantors of the bank's loan. MBI financed the remaining $500,000 of the purchase price with a loan to Outreach. Under the terms of its loan, MBI obtained a mortgage on the boats, but agreed to a two-year deferral on interest and repayment obligations.[7]

Outreach purchased MBI's four tugboats on April 13, 1984. Neither Mann nor Out-

---

**6.** Anthony McAllister directed Mann to contact the Westminister Bank for financing of the sale transaction. At the time, the bank held a mortgage on MBI's tugboats that secured a loan to another MT & T subsidiary.

**7.** The terms of MBI's loan to Outreach were more favorable than the terms required by the

bank. Not only did Outreach receive a two-year moratorium on interest and repayment, but the ten-percent rate on MBI's loan was three points lower than the bank's rate. Moreover, the bank's security interest in the boats had priority over MBI's interest in them.

reach invested any of their own money in the sale transaction.

### D. The Post-Sale Relationship Between MBI and Outreach

On the date of the sale, MBI and Outreach executed two documents that memorialized the terms of the transaction and structured the succeeding relationship between the two entities. The first document, a "Sales and Service Representation Agreement," obligated Outreach to provide tugboat services to MBI's Baltimore customers on a "first priority" basis. Although the agreement nominally permitted Outreach to solicit defined categories of work independent of MBI, it required Outreach to maintain at least two of its four boats fully-manned on a twenty-four-hour basis and to assign its boats to MBI's designated work before they could perform any other work. The agreement further named MBI as the "exclusive sales agent for Outreach" for all towing and docking work in Baltimore Harbor and precluded Outreach from independently soliciting work from any MBI customer. Similarly, the agreement barred Outreach from performing work for any MT & T customer within a fifty-mile radius of the other three Eastern Seaboard ports serviced by MT & T. Finally, because of the "first priority" provision, Outreach had to supply MBI with prior notice of its intention to perform independently acquired work in order to avoid scheduling conflicts.[8]

The Representation Agreement also required Outreach to serve MBI's customers "in a workmanlike manner and of a standard acceptable to [MBI]." Beyond general obligations to provide timely service, reliable equipment, and trained crews, the agreement also mandated Outreach's adherence to specific "standards of performance" vis-a-vis MBI's customers.[9] MBI, moreover, controlled the mechanisms for policing Outreach's obligations. The agreement provided that MBI had "the right to require Outreach to improve its performance to meet all [of the performance] criteria," and that Outreach must respond with its "plan for improvement" within twenty-four hours of receipt of a verbal or written complaint from MBI. In the event Outreach disputed an MBI improvement order, the agreement gave MBI the unilateral right to initiate an arbitration proceeding before the arbitrator of its choice. If Outreach repeated a performance violation, MBI had the exclusive right to terminate the relationship and force a resale of the tugboats back to MBI without profit or loss to Outreach.

Under further terms of the documents executed on the sale date,[10] MBI was obligated to remit payment to Outreach for the work it performed for MBI's customers—regardless of whether the customer paid for the work.[11] Outreach, however, was precluded from setting its own prices to MBI's customers. The Representation Agreement required it to price its services at rates established by MBI, and MBI had unilateral authority to raise or lower Outreach's prices as it saw fit.

---

8. These and other restrictions in the Representation Agreement rendered Outreach's right to solicit independent work largely illusory. Although Outreach's four-tug fleet was ill-equipped to handle assignments other than harborwork, the agreement expressly required Outreach to secure MBI's approval before it replaced any of the boats or added new boats to its fleet. It was undisputed that ninety-five percent of Outreach's business in its first year of operation was performed solely for MBI's Baltimore customers pursuant to MBI's referrals.

9. Among these standards were requirements that Outreach maintain twenty-four-hour contact with MBI's Baltimore representative, provide MBI with the phone numbers for its tugboat personnel, immediately notify MBI of any

incident involving damage to a customer's vessel or tardiness in carrying out an assignment, and coordinate its efforts with MBI "to properly oversee ... licensed personnel in order to eliminate repeated incidents [of pilot error]."

10. The second document, a "Credit Agreement," outlined the financial aspects of the transaction.

11. Under the terms of the Credit Agreement, MBI was required to pay Outreach up to $500,-000 immediately on Outreach's presentation of an invoice. This provision effectively relieved Outreach of the risk of nonpayment from the customer base that comprised ninety-five percent of its business in the first year of operations.

### E. Post-Sale Abrogation of Collective Bargaining Obligations

On the April 13, 1984, date of sale, MBI dismissed most of its Baltimore-based employees, but retained Rollins Bishop as its representative in charge of customer relations and the assignment of work to Outreach. Included within this wholesale discharge was MBI's entire Union labor force.

On the same day, Outreach hired MBI's dispatchers, Gross, Franey, and Johansen. Gross resumed his "former" position as Chief Dispatcher, and continued to perform the various personnel functions he performed for MBI.[12] To staff the boats, Outreach hired seventeen employees, thirteen of whom had some prior work experience with MBI. In making its hiring decisions, however, Outreach did not offer jobs to fifteen of MBI's Union employees. Twelve of these fifteen employees had greater seniority under MBI's collective bargaining agreements than the former MBI employees that Outreach hired.

Notwithstanding persistent Union demands, Outreach refused to honor the terms and conditions of employment established in the employees' collective bargaining agreements with MBI. It redefined the employees' job titles and responsibilities, cut wages below those required in the agreements, reduced the number of crew members on each boat, and eliminated all of the employees' bargained-for fringe benefits.

On the day following the sale, without a break in operation, Outreach began providing tugboat services to MBI's customers in Baltimore Harbor. The only palpable changes from the former operation were that Alcide Mann was inserted into the management structure and the shipboard employees no longer had the protections and guarantees of their Union contracts.

### F. MBI's Post-Sale Conduct

Despite the sale transaction and concurrent employee dismissals, MBI continued to hold itself out as a Baltimore tugboat operator employing a unionized labor force. In response to negative information circulated by a competitor, MT & T sent a notice to its customers' agents instructing them to reassure the customers that MT & T would be maintaining its four-port presence. The notice related that MT & T did not expect labor difficulties, and that despite substantial losses in its Baltimore operation, it had "the imagination and talent to initiate an unusual but effective operational change to insure McAllister service ... to [Baltimore] in the future."

In the months following the transfer, MT & T placed advertisements in various maritime-industry periodicals, continuing to represent itself as a tugboat operator in Baltimore Harbor. None of these advertisements mentioned the existence of Outreach or the involvement of any outside party in MT & T's (or MBI's) Baltimore operations. Finally, in August 1984, over four months after Outreach had commenced operations, MBI mailed its customers a letter advising them to expect rate increases in the near future. To justify the increases, the letter stated that MBI's "existing labor contracts" would terminate on September 30, 1984, and that MBI was "presently negotiating a new Labor contract which hopefully will be concluded for a period of three years." MBI refused the Union's demand for a retraction of the letter.

### G. Outreach's Post-Sale Operations

For the first five months of its operation, Outreach's work consisted exclusively of servicing MBI's customers pursuant to referrals from Rollins Bishop. In September and October of 1984, Outreach obtained small contracts to perform barge-work and icebreaking in Baltimore Harbor that were independent of MBI. These contracts accounted for less than five percent of Outreach's revenues; MBI's referred work made up the balance. By the end of the year, MBI was nearing the break-even point through the Outreach operation. The Board concluded that the only significant

---

12. These "management" hiring decisions were made by Outreach principally on the recommendation of Anthony McAllister. Outreach neither interviewed nor considered any other candidates for the jobs.

difference between Outreach's operations and MBI's prior operations was the reduction in the cost of labor.

## H. Administrative Proceedings

In June 1984, the Union filed an unfair labor practice charge against MBI and Outreach, asserting that the two entities were but a single employer and that MBI'S repudiation of its labor obligations and Outreach's subsequent refusal to honor the employees' contracts violated §§ 8(a)(1), (3), and (5) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1), (3), (5). The Board adopted the administrative law judge's findings and conclusion that MBI and Outreach had committed the charged unfair labor practices. Specifically, the Board found that the two companies were alter-egos and that they violated §§ 8(a)(1) and (5) of the Act by: 1) refusing to recognize and bargain with the Union; 2) abrogating the Union's contracts; 3) unilaterally changing terms and conditions of employment without bargaining with the Union; and 4) dealing directly with the employees in the establishment of new terms and conditions of employment. The Board further agreed that the companies violated §§ 8(a)(1) and (3) of the Act by discharging and refusing to reemploy the Union labor force for the purpose of evading MBI's statutory bargaining obligations.

## II.

The companies' principal contention on appeal is that the Board's finding of alter-ego status is not supported by substantial evidence. They stress that they share no common ownership, that the sale negotiations were conducted at arms length, and that the financing arrangements evince nothing more than a typical business transaction. Because of these factors, the companies insist that the Board misapplied this Court's standards for determining alter-ego status, and that they should properly be considered as separate entities. We disagree.

In *Alkire v. NLRB*, 716 F.2d 1014 (4th Cir.1983), we defined the standard for determining whether a new business entity under the labor laws is, in reality, the disguised continuance or alter ego of the old employing entity:

> When business operations are transferred, the initial question is whether substantially the same entity controls both the old and new employer. If this control exists, then the inquiry must turn to whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations.

*Id.* at 1020. The *Alkire* alter-ego standard implicitly requires an in-depth factual examination of all the circumstances surrounding a particular business transfer. *See id.* at 1018 and 1022–23 (Sprouse, J. dissenting). Such an analysis was conducted below. On the basis of an extensive evaluation of the evidence, the administrative law judge found, and the Board agreed, that MBI "reserved to itself the right and obligation to monitor and control not only the end result of Outreach's operations, but also the manner in which Outreach's licensed personnel carried out those operations." The Board further agreed that MBI "sold its boats to Outreach in order to evade its obligations under the union contracts." These findings, supported by substantial evidence, satisfy the *Alkire* alter-ego standard.

While factors such as independent ownership, "arms-length" negotiations, and the formalities of a modern business transaction may have some evidentiary value in resolving the *Alkire* inquiry, they are not a litmus test for determining alter-ego status. We determined in *Alkire* that the focal criteria of alter-ego analysis are the ensuing degree of control that the employer exerts over the operations of the new employing entity and the foreseeable ensuing benefit it secures as a result of purging its labor commitments. Here, substantial evidence supports the Board's conclusion that MBI obtained and exercised supervisory control over Outreach's performance and that the transfer resulted in a reasonably foreseeable benefit to MBI related to the elimination of its labor obligations.

The *Alkire* element of control is supplied by the terms of the Representation and Credit Agreements, as well as by the companies' operations thereunder. The agreements vested MBI with the right, and indeed the obligation, to direct and oversee Outreach's operation. The record establishes that Outreach did little more than execute MBI's orders to serve MBI's customers pursuant to the customers' contracts with MBI and MT & T. Indeed, Outreach existed almost exclusively for the purpose of servicing MBI's customers: as previously noted, MBI's referrals constituted ninety-five percent of Outreach's business. Moreover, the principal management personnel responsible for supervising the rank-and-file employees and directing the performance of MBI's customer contracts were "rehired" by Outreach to the same positions. Finally, the financial aspects of the transaction demonstrate that MBI sustained the full entrepreneurial risk of Outreach's failure.[13] These factors shatter the facade of independent operations. The companies' reliance on the legal formalities of separate incorporation and distinct equity ownership cannot conceal their inextricable relationship.

The companies also argue under the second prong of the *Alkire* test that there was not substantial evidence to sustain the Board's conclusion that MBI established Outreach "to evade its obligations under the union contracts and thereby eliminate its financial losses, and that this was the predictable result of the transaction." Again, we disagree. From the date it commenced operations in 1980 through 1983, MBI experienced steadily increasing losses.

Once its attempts to reduce costs and increase its market share proved unsuccessful, MBI turned to the Union for wage and fringe-benefit concessions. MBI's orchestration of the transfer to Outreach closely followed the Union's refusal of the proposed concessions. MBI's conduct *vis-a-vis* its own customers also raises a strong inference that its intentions were to escape its employee obligations while ostensibly maintaining its Baltimore presence. Of particular note are MBI's letters heralding the advent of "an unusual but effective operations change" to eliminate "substantial losses," its misleading advertisements, and its attempt to justify rate increases by referring to Union obligations it had previously disgorged. In sum, substantial evidence supports the Board's finding that the elimination of MBI's bargained-for employee commitments was the instrumental purpose motivating the transfer to Outreach.[14]

Relying on *University of Chicago v. NLRB*, 514 F.2d 942 (7th Cir.1975), the companies next assert that even if the Board correctly found them to be alter-ego enterprises, the work transfer and coordinate disavowal of Union obligations was nonetheless lawful. There is simply no merit to this contention. Neither *University of Chicago* nor any other decision permits employers unilaterally to evade their statutory bargaining obligations through the device of a corporate alter ego.[15]

Finally, the companies contend that the Board exceeded its remedial authority by holding them liable for docking-pilot fees that MBI's tug captains lost as a result of its unlawful repudiation of Union obli-

13. MBI's contentions with respect to the financial elements of the transaction are belied by the undisputed fact that without MBI's capital investment and agreement to act as loan guarantor the transfer could not have taken place. In our view, MBI's financial support of Outreach bears little resemblance to a typical business relationship between independent entities.

14. The imposition of alter-ego status under *Alkire* does not hinge on proof that the employer intended to evade the labor laws. Where, as here, such an intent is shown, however, the second prong of the *Alkire* standard will usually be satisfied. See *Alkire*, 716 F.2d at 1020 ("In many cases, the employer's intended benefit may be, in fact, evasion of a labor obligation; but that situation poses no problem for imposing *alter ego* status.") As previously observed, in the present case there was also substantial evidence that MBI's actions enabled MT & T to maintain its four-port presence with reduced labor costs.

15. Similarly, we cannot conclude that the Board erred in its refusal to reopen the record to permit MBI to present evidence that the Union received advance notice of the transfer to Outreach. See 29 C.F.R. § 102.48(d)(1) (1986) (allowing motions to reopen the record before the Board if the newly-discovered evidence "would require a different result.").

gations. As previously noted, the captains received a percentage of their income from shipowners for their services in individual docking operations. The companies argue that these payments represent collateral income sources not properly chargeable to the captains' principal employer under the collective bargaining agreement.

 Under § 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), the Board enjoys broad discretion in framing appropriate backpay remedies to make whole the victims of unlawful anti-Union discrimination. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); *see also Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 539–40, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); *cf. Universal Security Instruments, Inc., v. NLRB,* 649 F.2d 247, 261 (4th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). The remedial boundaries of the Board's authority are framed by the policies underlying the Act. Here, the Board's imposition of liability for lost docking-pilot fees operated to reimburse discriminatees for their lost earnings. Since the loss of such fees was directly attributable to the companies' unlawful conduct,[16] we cannot say that the Board abused its discretion in holding the companies liable for their reimbursement. In short, "make-whole" remedies effectuate the policy of the Act. *See NLRB v. Gullett Gin Co., Inc.,* 340 U.S. 361, 363–65, 71 S.Ct. 337, 95 L.Ed. 337 (1951).

ENFORCEMENT GRANTED.

---

16. These earnings cannot be considered "collateral to" the captains' employment with MBI. They were not independent contractors; they were MBI employees, and docking-pilot fees constituted a substantial component of their remuneration for work performed for MBI.